MARTINDALE *v.* LOBDELL-EMERY MANUFACTURING CO.

1. PRINCIPAL AND AGENT—CONTRACTS—AGENT'S AUTHORITY—LOGS AND LOGGING.

Where plaintiff contracted with defendant to cut and haul logs at a specified price, agreeing to do the work according to instructions, evidence that defendant's woods superintendent, who had on previous occasions assumed to direct the performance of similar contracts with defendant's consent, instructed the plaintiff to deck the logs at an agreed extra compensation, immediate shipment being impossible because of a shortage of cars, the trial court was warranted in submitting to the jury the question of the extent of the agent's authority.

2. SAME—CONTRACTS—AGENT'S AUTHORITY—EXTRA COMPENSATION —PLEADING—INSTRUCTIONS.

The court properly instructed the jury that plaintiff was entitled to recover, under the common counts, the value of the extra services performed, if they should determine that defendant's agent was acting within the scope of his authority in instructing plaintiff to perform them.

3. CONTRACTS—ORAL CONTRACT—STATUTE OF FRAUDS—WRITTEN CONTRACT—LOGS AND LOGGING.

Where plaintiff sued to recover one-half of the scaler's wages, alleged to have been paid by him pursuant to an oral contract with defendant that each should pay one-half, positive testimony by plaintiff that said contract was made subsequent to the written contract, the record as a whole sustaining this contention, he was properly allowed to recover, notwithstanding defendant's denial of any such arrangement at any time.

4. SAME—LOGS AND LOGGING—BREACH OF CONTRACT—DAMAGES.

Where defendant's logging contract gave it the right to stop the work if it was not being done properly and satisfactorily, and defendant stopped the cutting, claiming that plaintiff already had more logs cut than he could haul to the landing, in an action for damages for breach of contract and consequent loss of profits, the court properly instructed the jury that if an honest, fair-minded lumber-

man of ordinary intelligence, experience, and prudence would not have believed that the plaintiff, under the circumstances then existing, could haul the logs before the contract date expired, then plaintiff could not recover, but that if he had not been stopped he could have completed the contract of cutting and hauling, he could recover the difference between the contract price and the cost of putting in such logs as he could cut and haul.

Error to Montmorency; Emerick, J. Submitted June 25, 1915. (Docket No. 70.) Decided December 22, 1915.

Assumpsit by Grant E. Martindale against the Lobdell-Emery Manufacturing Company, a Michigan corporation, for damages for breach of contract. Judgment for plaintiff. Defendant brings error. Affirmed.

*Henry, Henry & Henry,* for appellant.

*Elmer G. Smith* (*Joseph H. Cobb,* of counsel), for appellee.

Originally the relations between the parties to this action were set forth in two separate contracts, as follows:

"This agreement, made and entered into this 15th day of July, A. D. 1911, by and between the Lobdell & Churchill Manufacturing Company of Onaway, Michigan, party of the first part, and Grant E. Martindale, of Onaway, Michigan, party of the second part, witnesseth:

"The second party agrees to lumber, cut, remove and deliver on the conditions and terms hereinafter mentioned, a part or all of the timber now growing, standing, lying and being on the following lands: Section 32, township 31 north, range 1 west, Otsego county, Michigan. * * *

"It is further understood and agreed that all of the timber is to be cut low on the stump and in the most economical manner for the saving of the timber, and from such portions of the section and in such kinds of

timber and in such quantities as the first party may direct from time to time.

"The second party further agrees that the work shall be done in a good workmanlike manner and that the instructions as to the manner in which this work shall be done shall be lived up to and carried out by the second party in all its details, and all the balance of the logs not specified above shall be cut in the standard lengths, from 8 to 16 feet.

"It is further understood and agreed that all logs are to be delivered free on board cars on the McGraw Branch of the Michigan Central Railroad, assorted as follows: All hemlock to be loaded by itself for distinct shipment. All basswood to be loaded by itself for distinct shipment. All elm to be loaded by itself for distinct shipment, if called for.

"An assortment in loading maple, beech and birch, if found necessary later by the first party.

"It is understood and agreed, further, that said party of the second part is to receive from the first party a price of $4.50 per M., log scale, and the official scale of the Michigan Central Railroad Co. shall be accepted as the final scale.

"It is understood and agreed, further, that the terms of settlement shall be as follows: Payment to be made to the party of the second part by the party of the first part on the 15th day of each month for all stock delivered during each previous month.

"The second party agrees to commence operation immediately and to commence shipping logs about the 5th or the 10th of August.

"And the second party further agrees and understands that should this work not be done satisfactorily to the first party, they, the first party, have the option of terminating this contract at any time.

"This contract shall be in force for so long a time as the work is done satisfactorily to the party of the first part, as stated above.

"By E. J. LOBDELL, President.
"G. E. MARTINDALE.

"Witnesses:
"G. E. TRIMM.
"M. E. CRUSE."

"Memorandum of agreement entered into this 9th day of September, A. D. 1912, between the Lobdell &

Churchill Manufacturing Company, of Onaway, Michigan, party of the first part, and Grant Martindale, of Onaway, Michigan, witnesseth:

"The said party of the second part is to log, cut, remove and clean all of the dead hemlock timber now lying, being, growing, or standing, which is marked and stamped to the boundaries on the outside of the burnt and dead wood timber on the following described land, which is included; hemlock timber blown over or lying flat throughout the lands as described herein.
\*      \*      \*

"Second party agrees to cut all of the above timber low on the stump and to take the trees and logs clean from the smallest to largest in exact accordance with instructions given by the Island Mill Lumber Company, of Alpena, Michigan. The same to be cut in as economical manner as possible by the first party and the second party agrees to cut the hardwood logs as far as possible into fifteen-foot lengths, all logs which will make clear and clean logs.

"The second party further agrees that all work shall be done in a good and workmanlike manner and to the entire satisfaction of the first party. It is fully understood and agreed between the first and second parties that should any part of this work not be properly done by the second party the first party has the right to stop the work and the second party agrees to vacate the premises at once without recourse, upon settlement being made for all work done in exact accordance with this contract and any timber which has been so cut by the second party not in exact accordance with the above instructions and contract, a reasonable price shall be deducted for cleaning up of said lands and for the work done in cutting such timber.

"It is further agreed that the delivery of all the above-mentioned timber and logs shall be made before April 1, 1913.

"The second party further agrees to furnish the first party with an accurate time sheet of men's names and time worked each week and a settlement shall be made for all labor performed on the premises delivering logs for the second party on the last Saturday of each and every month, and it is further agreed and understood that the party of the first part shall pay to the second

party for all logs delivered on the banks of the river at Rea's Landing and Hunt creek the sum of $4.00 per thousand feet, Scribner's rule, merchantable scale, and that payment shall be made for all work done the last Saturday of each and every month as follows: $2.50 shall be paid for all logs delivered or skidded and the roads made to them, and the balance of $1.50 is to be paid when the logs are delivered at Rea's Landing and Hunt creek.

"It is further understood and agreed that the second party shall have the balance of lumbering of hemlock timber on the above-described lands provided the prices for hemlock timber continue favorable and the railroad switch is put in to this timber, as talked and agreed to between the Boyne City, Gaylord & Alpena Railway Company.

"And it is further understood and agreed that the second party shall have the lumber, hard and soft wood timber, at such time as first party shall desire to have same delivered to be manufactured at Onaway, Michigan, into their various manufactured products.

"The above price is to include any decking that may be required.

"On each and every car loaded the second party is to furnish party of the first part with the number of each and every log on same.

"THE LOBDELL & CHURCHILL MFG. CO.,
"By E. J. LOBDELL, Pres.
"G. E. MARTINDALE.
"Witnesses:
"D. BERTRAND."

Prior to the execution of either contract the plaintiff had performed two or more lumbering contracts for the defendant under oral agreements. Before the first of the contracts in question was executed the plaintiff went over the ground to be lumbered with Mr. A. H. Blanchard, who was woods superintendent for the defendant company, and at whose request the first contract was made. Subsequently Mr. Lobdell, president of the defendant company, Mr. Blanchard, and the plaintiff met in the office of the defendant com-

pany where, after a conversation, the first contract was executed. Plaintiff seems to have immediately prepared for operations, and started the shipment of timber under the contract early in August, 1911. There is no doubt that it was contemplated between the parties that the operation should be carried on as a "hot-logging" operation. That is to say, it was expected that the trees would be cut down, immediately thereafter "swamped," "skidded," and hauled to the Mc-Graw Branch for loading, where they were to be immediately loaded upon cars furnished by the railroad company for the purpose of transportation to Bay City, where the defendant had contracts of sale covering the product. From early in August to about the 8th day of January, the Michigan Central Railroad Company supplied sufficient cars to permit the operation to proceed under the "hot-logging" practice. From that time forward the cars were not furnished in adequate numbers by the railroad company. When this situation arose, the plaintiff and Mr. Blanchard, defendant's woods superintendent, went to Bay City, and there interviewed the railway officials for the purpose of securing adequate car service. This, however, they were unable to accomplish. Whereupon, it is undisputed on the record that Blanchard directed plaintiff to continue the operations and deck all logs at the branch where they were to be loaded, and where they should lie until cars should be furnished later. In carrying out these instructions, plaintiff built 1,000 feet of extra side track, and thereafter decked about 1,500,000 feet of logs. These were not all decked at the same time, plaintiff loading from day to day such cars as were furnished with logs as they came from the cutting grounds. For extra labor in building the side track and decking these logs plaintiff claimed the sum of $750, being 50 cents per thousand. The record dis-

closes that the value of the extra services performed in this behalf was from $1 to $1.50 per thousand, but plaintiff and Blanchard agreed that the compensation should be 50 cents per thousand. Blanchard, defendant's woods superintenaent, as well as plaintiff, testified to this agreement. While defendant does not deny the making of this agreement between Blanchard and plaintiff, it does deny the authority of Blanchard to act as its agent and bind it.

A second controversy, arising under the first contract, involves the question of the payment of the wages of a scaler. The total amount paid by the plaintiff as the wages of a scaler was $700, one-half of which, $350, plaintiff claimed from defendant. Touching this item, it was the claim of the plaintiff that after the first contract was entered into it was agreed between himself and Mr. Blanchard, in the presence of Mr. Lobdell, who consented to the arrangement, that a scaler should be employed, mutually satisfactory to the parties, whose scale should be used as a check upon the scaler of the Michigan Central Railway, and that the wages of said scaler should be borne one-half by each party to the contract. This arrangement, testified to by plaintiff and Mr. Blanchard, was denied by Mr. Lobdell.

The third item of plaintiff's claim arises under the second contract, and grows out of the fact that on February 4th defendant ordered plaintiff to discontinue cutting on a portion of the so-called Montmorency contract. It is plaintiff's claim in this regard that he had built roads to the timber to be lumbered under the contract, and that he could have lumbered some 600,000 or 700,000 feet more timber had he not been unlawfully ordered to discontinue that operation. Plaintiff claims that by reason of defendant's unlawful act in ordering him to stop he lost a prospective profit of $1,200.

A second dispute arose between the parties growing out of the second contract. That contract provides:

"$2.50 shall be paid for all logs delivered or skidded and the roads made to them, and the balance of $1.50 is to be paid when the logs are delivered at Rea's Landing and Hunt creek."

Early in the performance of this contract a dispute arose between plaintiff and defendant as to the location of Rea's Landing. It was the contention of plaintiff that Rea's Landing was located upon the river about a mile and a half above Hunt creek, whereas the defendant claimed that it was located at a place called the "spout," very close to Hunt creek. Defendant held back a part of the contract price, thus compelling plaintiff to deliver the logs where defendant claims Rea's Landing was. This necessitated the watering and driving of the logs from the place where plaintiff had banked them on the river to the point claimed as Rea's Landing by defendant. For the extra services plaintiff demanded the sum of $500.00.

Plaintiff made four other claims against defendant under the two contracts, but as these were not submitted to the jury by the trial court, they may be disregarded.

Plaintiff's original bill of particulars was as follows:

| | |
|---|---:|
| 1911-1912. Building 1,000 feet railroad track, clearing ground for decking and decking 1,-500,000 feet logs at 50 cents per M | $750 00 |
| 1911-1912. Sorting 300,000 feet beech logs | 50 00 |
| 1911-1912. ½ scaler's wages 14 mo. at $50 | 350 00 |
| 1911-1912. Delay caused by not having sufficient cars | 250 00 |
| 1911-1912. Cutting 44,000 feet logs at $4.50 per M | 198 00 |
| 1911-1912. Going over grounds a second time | 44 00 |

Later an amended bill was filed in which the following items were claimed:

Damage for profits on 6,000,000 feet hemlock at
 $2.00 per thousand.........................$1,200 00
Driving logs................................   500 00

Defendant pleaded the general issue, and gave notices of set-off and recoupment, the general tenor of which was that the plaintiff had carelessly and incompetently performed the contract to defendant's damage, the items of defendant's demand being as follows:

1912.  To damages account of logs left undelivered under contract of September, 1912...   $269 49
To improper cutting of logs, same being cut too long and too short...................  1,000 00
To balance of maple, beech and elm logs and standing trees left in woods on Otsego job..   600 00

           $1,869 49

After an exhaustive trial of the issues so framed, plaintiff recovered a judgment in the sum of $1,580.42, which defendant now reviews in this court by writ of error.

BROOKE, C. J. (*after stating the facts*). The first item upon which the jury was permitted to pass was the sum of $750, the price agreed upon between Blanchard and plaintiff to be paid for the building of the 1,000 feet of side track, and the decking of the logs caused by the failure of the railroad company to furnish sufficient cars to permit plaintiff to conduct the operation after January 8th as a "hot-logging" proposition, which it is clear was the method of handling the job contemplated by the parties at the time the contract was made. As pointed out in the statement of facts, Blanchard, defendant's woods superintendent, testified to the fact of making the agreement for the extra compensation exactly in accordance with the claim of plaintiff. On behalf of defendant it

is urged that Blanchard was without authority, under the evidence, to modify the contract imposing an additional liability upon it. The contract provides:

"The second party further agrees that the work shall be done in a good workmanlike manner and that the instructions as to the manner in which this work shall be done shall be lived up to and carried out by the second party in all its details."

There can be no doubt under this section of the contract that the defendant, through its woods superintendent Blanchard, the contingency of the shortage of cars having arisen, ordered plaintiff to continue the operation and deck the logs at the siding. It should be borne in mind that the operation in question was being carried on in timber which had been injured by fire, and that it was necessary to have it cut and marketed speedily in order to prevent serious depreciation and loss. The authority of Blanchard to meet the exigency and to order a change in the method of the operation being unquestioned, it seems to us that plaintiff would have a clear right to recover the value of the extra services performed, under the common counts in his declaration, and under the uncontradicted testimony as to the value of such services contained in the record. Upon this question the court charged in part:

"And I charge you further, gentlemen, that if what Mr. Martindale claims for that service, that is to say, one-half dollar a thousand for 1,500,000 feet—if these services were fairly and reasonably worth that sum, he would be entitled to recover this sum of $750, which is his first claim in this case. Otherwise not.

"If you do not find that Mr. Blanchard had this authority, which I have spoken of, to oversee, supervise, manage, and control the outside operations in the woods of this concern, then Mr. Martindale hasn't a look-in on that claim. But if he had, then I charge you equally as the law that he had a right to make this

arrangement, which he says he made, to have Mr. Martindale put this excess of logs into these skidways and thereafter load them out. And if he promised that he should be paid for those services, then Mr. Martindale would be entitled to recover what those services—that is, the extra cost in loading out the skidded logs—what it was fairly and reasonably worth. He claims $750. It is for you to say whether he is entitled to that sum."

The first paragraph quoted above would seem to permit a recovery on the *quantum meruit*. The second predicates the plaintiff's right to recover upon the authority of Mr. Blanchard to fix the value of the extra services and bind his principal to pay the agreed sum. As indicated, we believe the first paragraph above quoted states the law applicable to the case, but we are further of the opinion that no error was committed by the court in submitting the question of Blanchard's agency to the jury under the testimony contained in the record. From Blanchard's testimony it fairly appears, we think, that he had, on various occasions during the period of his service with defendant, assumed to direct the performance of similar contracts, and that his principal, the defendant, had recognized his authority so to do. The testimony of plaintiff and Blanchard as to the method of doing business and as to the exercise of authority by Blanchard in this as well as in other similar contracts was, in our opinion, quite sufficient to carry to the jury the question as to whether Blanchard had authority to agree to pay the extra compensation. *Marx* v. *King*, 162 Mich. 258 (127 N. W. 341).

With reference to the second item of plaintiff's claim, one-half the scaler's wages, it seems to be defendant's contention that the oral agreement to divide the expense testified to by Blanchard and plaintiff was made prior to the execution of the written contract, which provides that:

"The official scale of the Michigan Central Railroad Company shall be accepted as final."

Plaintiff himself clearly testified that the arrangement was made subsequent to the execution of the contract, and we think a fair consideration of the entire record leads to the conclusion that the weight of the testimony is to that effect. Mr. Lobdell himself flatly denied the making of any such arrangement at any time.

As to the third item of plaintiff's damages arising from the closing down of the so-called Montmorency operation, defendant claims that it was acting within its legal rights in so doing in order to insure the delivery of all the logs then cut to the piling grounds designated in the contract before the snow should vanish in the spring. Counsel for defendant say:

"The defendant's position, for the reasons indicated above, and to insure the delivery of the logs already decked, was simply that Martindale should stop cutting any more timber until he had hauled this 1,500,-000 feet which was decked, and that he should use his dray haul force in hastening the delivery of these sleigh haul logs."

Upon this point the learned trial judge instructed the jury as follows:

"If you find from the evidence, gentlemen, in this case, by a fair weight and preponderance, that if Grant Martindale had not been stopped by the defendant, that he could have hauled out his sleigh haul logs, and also could have cut and put in this quantity of dead hemlock which he was using for his dray haul; that if he had not been stopped he could have completed the job on both kinds of timber—then I charge you that he would be entitled to such damages as I shall instruct you in a few moments. But, on the other hand, gentlemen, and from the different standpoint, I charge you expressly that if an honest, fair-minded lumberman, of ordinary intelligence, experience, and prudence, would not have believed that the plaintiff,

under the circumstances then existing, could put his sleigh haul logs then on skids to the river before April 1, 1913, and also put in the remaining dray haul timber, and that the defendant did not so believe, then the defendant had the right to instruct the plaintiff to stop cutting dray haul logs and use his force to get all the logs ready cut to the river before cutting any more logs of either kind.

"Now, gentlemen, if under these instructions you find that the plaintiff would be entitled to recover damages for being prevented from continuing his operation in cutting and hauling the dray haul logs, I must tell you what you might award him. It is the claim of the plaintiff, and he has given evidence tending to show that state of facts, that before this time he had constructed all necessary or useful roads for the purpose of taking out the remaining standing, dead hemlock timber, standing and lying dead hemlock timber on section 28; that there was a quantity of that of about 600,000 feet; that he had built all necessary roads and landings; and that he could have done that work for $2 per thousand feet. The contract price was $4 a thousand, and he claims to recover, as the measure of damage, $2 a thousand, or the difference between the cost of putting in the logs and the contract price; and I charge you, gentlemen of the jury, that if you believe he is entitled to recover under these instructions which I have just stated to you and repeated, that that would be the measure of his damage. Not $2 necessarily—I do not say $2. It is for you to say, first, how much timber there was there that he could have put in before the 1st of April. Not just 600,000 because he says so, unless you are convinced from the evidence that that is true—but he could recover the difference between the cost of putting in such timber as he could and would have put in and the contract price. That would be the measure of damages."

This instruction we think correctly states the law applicable to the facts. *Atkinson* v. *Morse*, 63 Mich. 276 (29 N. W. 711).

The last item involves a pure question of fact, and

was submitted to the jury under appropriate instructions.

The judgment is affirmed.

KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.